LAVERY, District Judge.
[¶1] The appellant, Holly Lane Bruegman (Mother), filed for divorce from the appellee, Colton Paul Bruegman (Father). After an evidentiary hearing on temporary custody, visitation, and child support, the district court ordered the parties to share legal and physical custody of their minor child pending a final hearing and required Father to pay temporary child support. The district court also, on its own motion, bifurcated the proceedings by entering a decree of divorce dissolving the marriage and leaving all remaining matters for a future order. After a full bench trial, the district court issued a final decision on custody, visitation, support, and property distribution granting the parties shared legal and physical custody of the minor child until he enters kindergarten, and granting primary physical custody to Father with visitation for Mother after that. Mother appeals claiming the district court should not have ordered shared custody and should have awarded her primary physical custody. We overrule our precedent disfavoring shared custody and affirm.
ISSUES
[¶2] Mother raises three issues for review:
I. Did the district court abuse its discretion when it ordered shared custody?
II. Did the district court abuse its discretion in ordering an automatic, anticipatory award of primary physical custody to Defendant when the child enters kindergarten in the absence of evidence or findings that modifying custody is in the child's best interest?
III. Did the district court abuse its discretion in awarding future primary custody to Defendant under the circumstances and evidence presented at trial?
FACTS
[¶3] The parties were married July 26, 2008. Mother graduated from Laramie County Community College, worked in admissions for a year and, after obtaining a bachelor's degree at a college in Missouri, was director of admissions from 2006 until 2014. After the birth of their child in the spring of 2014, Mother stayed at home full-time. Father continued to work full-time. He was self-employed through various business ventures largely in the oil and gas industry.
[¶4] After the birth of their child, the couple began experiencing marital difficulties *160 and in September 2014 Mother moved to Torrington, Wyoming and filed for divorce in Goshen County. During that case, the district court entered a temporary custody order which is not in the record. The record is unclear whether they were ordered to split each week nearly evenly or whether Mother had physical custody seventy percent of the time and Father had physical custody thirty percent of the time. Later in that case, after another temporary custody hearing in the spring of 2015, the parties shared temporary custody, splitting each week. The parties made efforts to reconcile the marriage and Mother later dismissed the first divorce action in February 2016.
[¶5] A few months later, on May 27, 2016, Mother filed this case. By that time Father had moved to Wheatland, Wyoming and Mother had moved back to Cheyenne, Wyoming. Father began ranching and Mother began working as a realtor at Century 21. After a hearing on temporary custody, visitation, and support on August 23, 2016, the district court divorced the parties and ordered the parties to share custody equally week to week, with exchanges every Sunday. A bench trial was held April 18, 2017, and the district court entered its decision on custody, visitation, support, and property division on May 22, 2017.
[¶6] The district court viewed this case as close, with two fit, competent parents willing to accept the responsibilities of parenting. Both parents supported the child's best interests by taking advantage of opportunities to spend time with the child and encouraging the child's relationship with the other parent. The district court found the child had a good relationship with both parents but a very close, special bond with Father, who was probably the child's primary caretaker, with Father taking the child with him while he works around the ranch.
[¶7] The trial court found Father's large extended family and close friends, a strong support system, weighed in his favor. Mother's babysitter and close friend planned to move and Mother's family lived in Nebraska. The court was concerned about Mother's ability to make ends meet. She had just started a new job and testified she took home $2,000 per month with a $1,799 per month mortgage. The district court noted Father's work situation was stable, although he had significant debts. While Mother had some flexibility at work, her work obligations were still developing. The court predicted she would likely be able to tailor her work schedule to facilitate what the court characterized as generous visitation during the school year, three weekends per month and one afternoon/evening each week, while Father would be readily available to care for the child after school daily due to his self-employment.
[¶8] A substantial portion of the evidence was devoted to the level of conflict in the parties' relationship, and the district court carefully weighed this.
Wyo. Stat. § 20-2-201(a)(vii) requests courts to evaluate the "ability and willingness of each parent to allow the other to provide care without intrusion, respect the other parent's rights and responsibilities, including the right to privacy." The Court finds that, at times, the parties have intruded on each other's right to privacy. This may have been partially due to the efforts of the parties to reconcile. Now that they are divorced, continuing to stay the night at each other's residences might result in confusion for [the child]. However, the parties are free to make their own decisions regarding whether they will or will not let the other party see [the child] during their own parenting time. The parties will be ordered to notify each other and get permission before they come to the other's residence for any reason other than scheduled pick-ups. The Court will caution the parents to respect the other's boundaries and parenting time with [the child].
At trial, Mother introduced three video recordings she took of fights between her and Father. Father testified he was set up, intentionally angered so that Mother could record his outburst. The court was concerned about the context of the recordings but acknowledged that they'd had a tumultuous last couple of years of marriage. The court specifically found no evidence of spousal abuse nor evidence that Father lost his temper with his son or any sort of child abuse occurred.
*161 [¶9] The district court also considered the child's special needs a relevant factor, concluding this factor did not weigh against allowing shared custody for the child because the federally subsidized non-profit centers serving preschool-aged children with special needs in Cheyenne and Wheatland jointly evaluated the child and developed an individualized education program (IEP) for him. Though it might be challenging, both centers are required to follow the IEP and he would receive the same instruction if he were to switch between centers.
[¶10] The district court ultimately concluded it was in the minor child's best interests to continue to see each parent as much as possible, ordering shared custody with exchanges every two weeks. The court viewed this as the best way to maintain the close relationship with each parent that had developed to date. As the parties live fairly close to each other but not in the same community, the district court ordered shared custody to continue until the child enters kindergarten, at which time Father would have primary physical custody and Mother would have liberal visitation. Mother filed a timely notice of appeal.
STANDARD OF REVIEW
[¶11] Wyoming "law affords wide discretion to the district court when fashioning custody and visitation provisions for the best interests of the children." Pace v. Pace , 2001 WY 43, ¶ 11, 22 P.3d 861, 865 (Wyo. 2001) (quoting Reavis v. Reavis , 955 P.2d 428, 431 (Wyo. 1998) ). This "discretion encompasses one of the most difficult and demanding tasks assigned to a trial judge." Pace , ¶ 11, 22 P.3d at 865 (citing Reavis , 955 P.2d at 431 ).
This Court has consistently recognized the broad discretion enjoyed by a district court in child custody matters. We will not interfere with the district court's custody determination absent procedural error or a clear abuse of discretion. In determining whether an abuse of discretion has occurred, our primary consideration is the reasonableness of the district court's decision in light of the evidence presented. We view the evidence in the light most favorable to the district court's determination, affording every favorable inference to the prevailing party and omitting from our consideration the conflicting evidence.
Ransom v. Ransom , 2017 WY 132, ¶ 9, 404 P.3d 1187, 1190 (Wyo. 2017) (quoting JCLK v. ZHB , 2015 WY 95, ¶ 8, 353 P.3d 720, 721 (Wyo. 2015) (quoting Durfee v. Durfee , 2009 WY 7, ¶ 6, 199 P.3d 1087, 1089 (Wyo. 2009) ) ). "In determining whether there has been an abuse of discretion, the ultimate issue is whether or not the court could reasonably conclude as it did." Womack v. Swan , 2018 WY 27, ¶ 11, 413 P.3d 127 (Wyo. 2018) (quoting Ready v. Ready , 906 P.2d 382, 384 (Wyo. 1995) (citations omitted) ). "A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances." Stevens v. Stevens , 2014 WY 23, ¶ 8, 318 P.3d 802, 805 (Wyo. 2014) (quoting Bingham v. Bingham , 2007 WY 145, ¶ 10, 167 P.3d 14, 17-18 (Wyo. 2007) ). We "do not overturn the decision of the trial court unless we are persuaded of an abuse of discretion or the presence of a violation of some legal principle." Stevens , ¶ 8, 318 P.3d at 805 (quoting Fink v. Fink , 685 P.2d 34, 36 (Wyo. 1984) ).
[¶12] Mother challenges the sufficiency and weight of the evidentiary findings, to some degree, in every issue presented by her on appeal. "Findings of fact not supported by the evidence, contrary to the evidence, or against the great weight of the evidence cannot be sustained." Id. (quoting Jones v. Jones , 858 P.2d 289, 291 (Wyo. 1993) ). Similarly, an abuse of discretion is present "when a material factor deserving significant weight is ignored." Vanasse v. Ramsay , 847 P.2d 993, 996 (Wyo. 1993). However,
"In reviewing a challenge to the sufficiency of the evidence, we accept the evidence of the successful party as true and give all favorable inferences to that evidence." Cranston v. Cranston , 879 P.2d 345, 351 (Wyo. 1994) (citing Hill v. Zimmerer , 839 P.2d 977, 981 (Wyo. 1992) ). "We leave out of consideration entirely the conflicting evidence of the unsuccessful party." Cranston , 879 P.2d at 351 (citing *162 Kadrmas v. Valley West Homeowner's Ass'n , 848 P.2d 826, 828 (Wyo. 1993) and Hill , 839 P.2d at 981 ).
Zupan v. Zupan , 2010 WY 59, ¶ 16, 230 P.3d 329, 334 (Wyo. 2010).
DISCUSSION
I. Shared Custody Standard of Review
[¶13] Mother claims the district court abused its discretion in ordering shared custody in violation of this Court's clear rule that shared custody arrangements are disfavored. Buttle v. Buttle summarized shared custody precedent.
In Testerman [v. Testerman , 2008 WY 112,] ¶ 15, 193 P.3d [1141,] 1145 [ (Wyo. 2008) ], this Court reviewed our precedent concerning shared custody.
"We have repeatedly said that divided or shared custody is not favored by this Court absent good reason therefore." Eickbush [v. Eickbush , 2007 WY 179,] ¶ 11, 171 P.3d [509,] 512 [ (Wyo. 2007) ]. We have explained that "stability in a child's environment is of utmost importance to the child's well-being," Reavis , 955 P.2d at 432, while "a measure of instability is inherent" in joint custody arrangements. Gurney , 899 P.2d at 55. We have emphasized that the "success of a joint or shared custody arrangement hinges on the extent to which the parents are able to communicate and agree on the matters relevant to the children's welfare." Reavis , 955 P.2d at 433.
When a district court's exercise of discretion in custody matters involves splitting custody of children between parents or other unconventional custody approaches, we have said it must provide an explanation of its reasoning and place its findings on the record so that, upon review, this Court can be sure that a comprehensive evaluation of all relevant factors occurred prior to determining custody. Pace v. Pace , 2001 WY 43, ¶ 17, 22 P.3d 861, 867 (Wyo. 2001).
...
... Among the most frequently cited contraindications for joint custody is parents who do not live in close proximity. As one child custody authority has said:
The frequent shifts back and forth in the child's environment with the child having two "primary" homes, requires a great deal of flexibility and cooperation both on the part of the parents and the child. * * * The degree to which a particular arrangement will work may depend not only on cooperation and flexibility, but also on proximity of the parents and the emotional adaptability of the child. When parents live near each other, the child may not have to face the added adjustment of two different peer environments.
Jeff Atkinson, 1 Modern Child Custody Practice § 6-6, 6-9 (2004). Here, the parents do not live in close proximity. Under these circumstances, the district court's finding that they are both "good parents" does not support shared custody.
Another important factor for our consideration in reviewing the district court's order is the extent to which the parents are able to communicate and work together to promote the child's best interest.
The premise of the joint custody order is the parents' ability to resolve between themselves the custodial details. There can be little question that joint custody requires sincere dedication on the part of each parent to safeguard the security and stability vital to a child's best interest. When the parents are unable to make this cooperative arrangement work, a change of circumstances justifying judicial reexamination of the original joint custody order is demonstrated.
Gurney v. Gurney , 899 P.2d 52, 55 (Wyo. 1995) (citation omitted). Similarly, when the evidence demonstrates the parents have been unable to communicate during the marriage, a joint or shared custody order is not appropriate in the first place.
Buttle v. Buttle , 2008 WY 135, ¶¶ 31-32, 38-39, 196 P.3d 174, 181, 183 (Wyo. 2008). While "there may be cases where joint or shared physical custody may approximate the former family relationships more closely than other custodial arrangements, or for other good reason may be in the best interests of the children ... divided physical custody may not be indiscriminately substituted for *163 an award of sole custody to one parent in order to appease one party." Reavis , 955 P.2d at 432.
[¶14] The thrust of Mother's argument is that the district court never really articulated its reasoning for imposing a joint custody arrangement other than to ensure that both parents have equal time with the child. We have called this "a laudable goal" that "falls well short of the 'good reasons' needed to justify" a disfavored form of custody and said the fact that both parents are good parents is "true in many, if not most, divorces" but is "not sufficient to support a custody arrangement that this Court has noted is not favored and carries the potential for disrupting the child's life." Testerman , ¶ 17, 193 P.3d at 1146 (cited in Buttle , ¶ 42, 196 P.3d at 184 ); Buttle , ¶ 38, 196 P.3d at 183.
[¶15] Father argues denigrating shared custody is unjustified. He first directs us to the statutory requirement that "[c]ustody shall be crafted to promote the best interests of the children, and may include any combination of joint, shared or sole custody." Wyo. Stat. Ann. § 20-2-201(d) (LexisNexis 2017). A recent special concurrence expressed that the presumption that shared custody is contrary to the best interests of the child is inconsistent with this statutory directive. Ransom v. Ransom , 2017 WY 132, ¶ 37, 404 P.3d 1187, 1195 (Wyo. 2017) (Burke, C.J., specially concurring). This presumption is archaic.
Many states that formerly recognized a presumption against shared custody have, through legislation or court decision, rejected it. Maritza Karmely, Presumption Law in Action: Why States Should Not Be Seduced into Adopting a Joint Custody Presumption , 30 Notre Dame J.L. Ethics & Pub. Pol'y 321, 325 (2016). As explained in a thoughtful opinion from the Supreme Court of Iowa:
[I]n light of the changing nature of the structure of families and challenges to the sweeping application of psychological parent attachment theory, we believe the joint physical care issue must be examined in each case on the unique facts and not subject to cursory rejection based on a nearly irrebuttable presumption found in our prior cases. ... Any consideration of joint physical care, however, must still be based on Iowa's traditional and statutorily required child custody standard-the best interest of the child. See Iowa Code § 598.41(5)(a ). Physical care issues are not to be resolved based upon perceived fairness to the spouses , but primarily upon what is best for the child . The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity.
In re Marriage of Hansen , 733 N.W.2d 683, 695 (Iowa 2007) (emphasis in original). See also Taylor v. Taylor , 306 Md. 290, 303, 508 A.2d 964, 970 (1986) ("We emphasize that in any child custody case, the paramount concern is the best interest of the child. ... The availability of joint custody, in any of its multiple forms, is but another option available to the trial judge."); Beck v. Beck , 86 N.J. 480, 486-88, 432 A.2d 63, 65-66 (1981) ; Dodd v. Dodd , 93 Misc.2d 641, 646, 403 N.Y.S.2d 401, 404-05 (1978).
Id . Father points out other deleterious effects of our rule disfavoring shared custody. Disfavoring shared custody erodes the standard of review giving every favorable inference to the prevailing party and omitting conflicting evidence and is in derogation of the great deference afforded the trial court. The law in Wyoming has been clear that shared custody is not favored "absent good reason." Id. ¶ 16, 404 P.3d at 1191 (citing Eickbush , ¶ 11, 171 P.3d at 512 (collecting cases) ). It has been less clear what "good reasons" a trial court must articulate to justify ordering a disfavored form of custody and to what extent the heightened scrutiny of shared custody allows us to substitute our judgment of what the facts seem to point to for that of the trial judge. The presumption against shared custody also allows one party to effectively veto a shared custody arrangement that would be in the best interests of the child by simply refusing to agree to it.
[¶16] In Wyoming, the fundamental consideration in determining child custody should *164 be "the best interests of the children." Wyo. Stat. Ann. § 20-2-201(a) (LexisNexis 2017). We hold there is no presumption that shared custody is contrary to the best interests of the children and shared custody should be considered on an equal footing with other forms of custody.
II. The District Court's Shared Custody Determination
[¶17] Overall, Mother contends shared custody will not promote stability in the child's life and the parties are unable to communicate or agree on major issues affecting the child well enough to facilitate a shared custody arrangement.
The Child's Developmental Needs
[¶18] More specifically, Mother argues stability was a major factor to be considered due to their child's developmental delays. The parties attended a multidisciplinary team evaluation to develop an IEP for their child. The assistant director and special education coordinator of the STRIDE Learning Center in Cheyenne, Wyoming testified the child qualifies for services under federal law due to cognitive and communication developmental delays. Specifically, he is to receive 160 minutes per month of pre-academic skills and social interactions to address his cognitive challenges, 160 minutes per month of speech language therapy, and 40 minutes per month of occupational therapy. He could receive these services by attending preschool at STRIDE three hours per day, four days per week.
[¶19] Mother emphasizes the special education coordinator's testimony that receiving specialized instruction is critical to this child being successful as well as her testimony that, in general, young children grow by having a consistent program and fluctuation in schedules is a challenge for young children. Mother's argument that the district court did not address the potential difficulties the child may experience splitting time between two different learning facilities is not correct. The district court noted the testimony that the child "would receive the same instruction if he were to switch between the Cheyenne and Wheatland centers," although "it might be challenging." The district court undoubtedly considered this evidence as a factor, specifically finding shared custody is appropriate because the child can get the same preschool curriculum regardless of which town he is in at a given time.
[¶20] Mother also argues "the district court was presented with no evidence of what had been done in the Wheatland learning center to address [the child]'s IEP; the court only had before it evidence of what had been done in the Cheyenne STRIDE facility." Mother fails to mention that conflicting evidence on this point exists in the record, including: testimony that the child has been receiving services in Wheatland as an infant; the multidisciplinary assessment for his IEP was done in Wheatland; representatives from the Wheatland child development center and STRIDE participated in the IEP; both parents have taken him to speech therapy at the child development center in Wheatland; folks from the child development center visit his daycare to work with him; and he is already enrolled for the fall schedule.
[¶21] Mother contends the child's development was a major issue between the parties and the parties testified to different philosophies regarding the child's developmental delays and needs for services. Mother believes their disagreements are similar to those in Williams v. Williams .
The parties' inability to make joint decisions on matters relevant to NJW's welfare also demonstrated that the shared custody arrangement was not working during the temporary custody period. One of the primary indicators that shared custody will work is the ability of the parents to communicate and cooperate. This naturally requires that the parents have shared goals and philosophies on how the child should be raised. It is clear from the evidence presented that the parties in this case had significantly different philosophies regarding the developmental services NJW should receive. Mother was of the mind that NJW should receive all of the services available to ensure her development. Father, however, believed that NJW should be raised in a manner that made her feel normal, and that some services are *165 not necessary. The parties had significant disagreements over these philosophical differences during the temporary custody period.
Williams v. Williams , 2016 WY 21, ¶ 27, 368 P.3d 539, 548 (Wyo. 2016) (citations omitted).
[¶22] Mother asserts the parties clearly testified to different philosophies regarding the child's cognitive development and need for services and the district court failed to address how those views prevented the parties from being able to successfully exercise shared custody. Mother's citations to the record on this point do not support her contentions. Indeed, both parties view their child as very smart but with developmental, speech delays that require services. Neither views the assessments of him so far as entirely satisfactory. Father thinks speculation he may have autism seems incongruous. Mother testified she believes a better explanation may have been missed and the child needs to be further evaluated. The father in Williams initially objected to the child receiving any recommended development services at all and later objected to the child receiving additional recommended developmental services. Williams , ¶ 11, 368 P.3d at 543. In this case, Father was concerned about the regression in the child's speech. Mother doesn't point to evidence that Father hindered or objected to obtaining services for their child. Father participated in the IEP process and, as set forth above, the record reflects Father has ensured the child receives the services he needs while in Father's physical custody.
[¶23] Under our abuse of discretion standard of review, we cannot say the district court was required to view stability in the child's schedule or routine as more important to the child's best interests than ensuring he sees each parent as much as possible. The record supports the district court's decision.
Ability of the Parties to Communicate
[¶24] The last major factor Mother argues is the ability of the parties to communicate. Mother testified that she and Father had difficulties communicating due to Father's temper. The district court was shown videos of Father's temper and arguments between the parties that occurred in front of the child. The district court's decision considered evidence of Father's temper.
At the hearing, [Mother] introduced three video recordings that she took of fights between her and [Father]. [Father] claimed [Mother] "trapped" him and essentially got him angry on purpose so she could record his reaction. The Court has no way of discerning the context of these recordings. The parties have had a tumultuous last couple years of marriage. Defendant seems regretful that he lost his temper at times in the past. Overall, the Court does not find evidence of spousal abuse. Further, there has been no evidence whatsoever that Defendant loses his temper with his son or that any sort of child abuse occurred.
Mother does not suggest these findings are not supported by the evidence, contrary to the evidence, or against the great weight of the evidence. While there is no question that the parties fought, the videos predate the temporary custody hearing.[1] We have recognized it is not an abuse of discretion to afford little weight to poor behavior during a marriage. Williams , ¶ 17, 368 P.3d at 545 (father had engaged in "sophomoric behavior," having a party late at night while mother and child were sleeping). And we have recognized it is not an abuse of discretion to decline to base a custody decision on past bad behavior no longer occurring. Id . ¶ 18 (spousal abuse occurred in the past but father was "evolving" and "to the extent it existed and did exist ... that it is not there anymore"). The district court did not abuse its discretion when it declined to base its custody decision on evidence of strife at the end of the marriage.
[¶25] Mother also argues in her brief that their communication difficulties adversely impacted the child, asserting Father failed to communicate with her about the child's *166 health insurance lapsing. The citations to the record relied upon by Mother do not support her contention. She testified (emphasis added):
We found out late last summer that [the child] actually hadn't had health insurance for two or three months. There-He was on the company policy with 307 [Inc.] which I was, too, and all of [Father]'s other employees, and we found out that the insurance premiums had not been paid, and so there was a lapse in coverage then, which I know [Father], you know, worked with Blue Cross-Blue Shield, I believe it was, to get them all reinstated to figure out, I think they maybe did some-some sort of payment if they needed to.
Father explained the lapse in insurance payments was due to an employee's embezzlement. Mother's brief fails to draw a logical connection between an unanticipated lapse in insurance due to an employee's malfeasance and the parties' difficulties communicating.
[¶26] Mother finally argues the district court failed to address the parties' inability to communicate well enough to make joint decisions regarding the child. In part, this argument rehashes Mother's argument that the parties disagreed about the child's developmental delays. In addition, Mother cites Father's testimony that the parties do not often make joint decisions regarding the child-specifically, that he does not get to be involved in making many decisions. He testified "I don't necessarily argue with her decisions, but my decisions aren't welcome very often, so ... I didn't get to decide where he was going to have his birthday party. She did that ...." Father went on to testify that Mother chose STRIDE,[2] daycare, and babysitting providers in Cheyenne without his involvement. Father also testified this was not a problem. "I don't get to make very many decisions. I'm not saying my wife makes bad decisions. I'm not saying she makes decisions counter-productive to my son's development. It's just-I don't get to make decisions. It's up to my wife."
[¶27] Mother fails to explain why the district court should have considered this problematic when Father apparently did not. As the district court's decision notes, Father testified they get along "pretty dang good" most of the time. Father also testified that at times Mother has not allowed him to spend extra time with or visit the child during her custodial weeks, but then has invited him back, and they have shared the child effectively. Mother also fails to explain why Father ought to be involved in selecting childcare providers in Cheyenne. Each party is capable of "arranging for each child's care by others as needed" independently. Wyo. Stat. Ann. § 20-2-201(a)(ii) (LexisNexis 2017). The district court's order does address the child's birthday, allocating half of outside of school time to each parent. Mother does not point to any instance where the parties were unable to resolve a decision concerning the child's welfare or the types of services he should be provided. Cf. Williams , ¶ 27, 368 P.3d at 549 (parties' inability to make joint decisions on matters relevant to child's welfare demonstrated shared custody arrangement was not working during temporary custody period).
[¶28] Overall, the record is replete with instances of the parties' cooperating and sharing time with the child, including sharing his birthday, caring for him in lieu of a babysitter, spending time with him at each other's homes during each other's custodial weeks, communicating with each other about him frequently, and allowing the other party to take the child to family events. It was reasonable for the district court to conclude that the long standing shared custody arrangement has not been contrary to the child's best interests or caused undue difficulties for the parents. In re KRA , 2004 WY 18, ¶ 20, 85 P.3d 432, 439 (Wyo. 2004). As in In re KRA , a shared custody arrangement most closely approximates the former family relationship-it has been the custody arrangement for the majority of the child's life. Id . ¶ 19, 85 P.3d at 438 ; cf. Williams , ¶ 25, 368 P.3d at 547 (temporary shared custody period took place during summer months not comparable to the parties' lives the rest of the year since both work as teachers).
[¶29] Under our abuse of discretion standard of review, we cannot say the district *167 court was required to find the difficulties the parties had with communication at times outweighed the child's interest in ensuring he sees each parent as much as possible. The record supports the district court's decision.
[¶30] The district court's findings reveal that all relevant factors were thoughtfully analyzed and carefully weighed in discerning the best interests of the child before arriving at its conclusions. Accepting the evidence of Father as true, giving all favorable inferences to that evidence, and leaving out of consideration entirely the conflicting evidence of Mother, the record and the trial court's findings fully sustain the overall conclusion that the shared custody plan is in the child's best interests.
III. Change of Custody When the Child Attends School
[¶31] Mother argues the shift from shared custody to primary physical custody with Father and visitation with Mother when the child enters school is an improper anticipatory modification of custody. We have repeatedly condemned decree provisions which provide that a parent's relocation constitutes a material change in circumstances. We recently reviewed our precedent on this issue in Hanson v. Belveal . There the district court ruled a decree provision which stipulated that a move outside Wyoming by either parent would constitute a material change in circumstances could not serve as a basis to modify the decree's custody provision because the court was required to make an independent determination of whether there has been a material change in circumstances that would support a custody modification. Hanson v. Belveal , 2012 WY 98, ¶ 20, 280 P.3d at 1193. We explained why the district court's decision was correct.
It is unrealistic to expect divorced parents to remain forever in the same location, Testerman , ¶ 18, 193 P.3d at 1146, and whether a parent's relocation is a material change in circumstance is a fact sensitive analysis that requires consideration of more than just the relocation itself. Love [v. Love ], 851 P.2d [1283,] 1287 [ (Wyo. 1993) ] ; Martin [v. Martin ], 798 P.2d [321,] 323 [ (Wyo. 1990) ]. Decree provisions that purport to define an event that will constitute a material change of circumstance or affect a child's best interest at some future undefined time are therefore particularly problematic. As we explained in Martin , where the decree provided for an automatic change of custody if either parent moved from Laramie:
The district court's anticipatory conclusion that the best interests of the children will be served by a nine-month/three-month split in favor of the parent remaining in Laramie is an abuse of discretion. As noted above, the test for child custody is the best interests of the children, and such a decision cannot be made without the district court having before it all facts necessary to make such a determination. What those facts may be, if and when one or the other parent leaves Laramie, can only be pure speculation at this point in time. Such speculation is not a substitute for complete analysis of all existing circumstances when and if a change in the established child custody arrangement becomes necessary.
Martin , 798 P.2d at 323 ; see also Testerman , ¶ 19, 193 P.3d at 1146 (holding district court abused its discretion by including a provision in the decree that either parent's relocation "may be considered by the Court as a change of circumstances sufficient to give the Court jurisdiction to consider a custody modification"); Harshberger [v. Harshberger , 2005 WY 99,] ¶ 8, 117 P.3d [1244,] 1249 [ (Wyo. 2005) ] (noting that Court has rejected such a scheme because it circumvents the district court's duty to evaluate custody decisions).
... the district court ruled that it must independently evaluate all of the facts and determine whether there had been a material change of circumstances. The question Father presents is essentially whether the parties' relocation stipulation deprived the district court of its discretion to make that determination. We hold that the parties' agreement did not and could not have stripped the court of its authority and obligation to independently determine whether *168 there had been a material change in circumstances.
The parties' agreement suffers from the same defect this Court found in the decrees at issue in Martin and Testerman . The relocation stipulation was an "anticipatory conclusion" that a move outside Wyoming by either parent would result in a material change to the detriment of the parties' child. See Martin , 798 P.2d at 323. In fact, the parties did not and could not know that a move by either parent outside Wyoming would result in a material change of circumstances. The conclusion was purely speculative and made without consideration of the surrounding facts, and the district court thus would have abused its discretion had it accepted the parties' prior agreement as grounds to find a material change of circumstances. See Martin , 798 P.2d at 323 ; Testerman , ¶ 19, 193 P.3d at 1146.
An agreement by the parties to a modification proceeding that there has been a material change of circumstances is not and cannot be a substitute for the district court's evaluation of the surrounding facts and its independent determination that there has been the required change in circumstances. As noted above, a district court's authority to modify a divorce decree is statutorily confined to those instances where there has been a material change in circumstances and in the absence of such a finding, the court is without subject matter jurisdiction to modify custody. Weiss [v. Weiss , 2009 WY 124,] ¶ 13, 217 P.3d [408,] 412 [ (Wyo. 2009) ] ; [In re] TLJ, [2006 WY 28] ¶ 8, 129 P.3d [874] at 876 [ (2006) ]. We have long held that parties may not waive jurisdictional defects or consent to subject matter jurisdiction where it otherwise does not exist, and the parties' stipulation that there has been a material change in circumstances thus cannot be the controlling consideration. See Weller v. Weller , 960 P.2d 493, 496 (Wyo. 1998) ("A lack of subject matter jurisdiction constitutes a fundamental defect in a proceeding which cannot be cured by waiver or consent by the parties."); White v. Bd. of Land Comm'rs , 595 P.2d 76, 79 (Wyo. 1979) ("Parties cannot confer jurisdiction by consent.").
Hanson, ¶¶ 24-27, 280 P.3d at 1195-96.
[¶32] Mother argues the shift in custody when the child begins attending school is based on numerous speculations that were not before the district court at trial. Mother first argues the district court erred in assuming the child would go to school. This argument has no merit. Children go to school. The trial court was not required to check its common sense at the door. Mother next infers that because the district court's decision states it is in the child's best interest to continue shared custody until it is no longer practical, the district court must have based its decision on speculation that the geographic distance between the parties won't change. Mother does not, and could not reasonably, dispute that shared custody is not practical once the child attends school if the geographic distance between the parties remains the same.
[¶33] As Hanson , Testerman , and Martin specifically hold, it's impossible to know whether either or neither party in a case will move at some point and, if so, whether that would be a material change in circumstances. In this case, there was some speculation about a move but no evidence either party planned to move. The district court recognized this when it "emphasize[d] that its custody arrangement is predicated upon both parties living in Wyoming in fairly close proximity to each other" and recognized that a modification may be appropriate if a party moved far away. The court was clear that as between primary custody with Mother and primary custody with Father, the evidence weighed slightly in favor of primary custody with Father. Because shared custody is the best arrangement for the child, it was ordered to continue as long as possible under the assumption no material change in circumstances which affect the child's welfare occurs after the decree.
[¶34] The only thing the district court assumed would change is the child's age. We have held that it is proper to accommodate a growing child. In JS v. MB , the district court split each week in half until the child reached the age of five, then shifted to alternating *169 weeks. JS v. MB , 2010 WY 114, ¶ 4, 237 P.3d 974, 975 (Wyo. 2010). The father complained the district court erred in ordering the latter arrangement without a separate hearing to determine the child's best interests at that time. Id . ¶ 6, 237 P.3d at 975. We held the "district court did not abuse its discretion in ordering the parties to alternate weeks with the child beginning at age five. In ordering as it did, the court simply modified the current visitation arrangement to accommodate the growing child, which is routinely done in long-term custody and visitation plans." Id . ¶ 15, 237 P.3d at 978.
[¶35] We have criticized the failure to do so. We faulted the shared custody order in Buttle for leaving open the question of where the child would reside when he reaches school age, requiring the parties to return to court in less than a year. Buttle , ¶ 42, 196 P.3d at 184. In Long v. Long , we remanded a custody determination for the district court to make findings whether a custody settlement was in the best interests of the children. Long v. Long , 2018 WY 26, ¶¶ 24-25, 413 P.3d 117, 125-26 (Wyo. 2018). We also remanded for the district court to enter an appropriate visitation schedule. Id . ¶ 27, 413 P.3d at 126. The visitation provision in the stipulation, awarding "reasonable visitation rights" to the non-custodial parent, did not conform to the requirement of Wyo. Stat. Ann. § 20-2-202 to "order visitation in enough detail to promote understanding and compliance." Id . ¶¶ 26-27, 413 P.3d at 126. We explained that "[a] proper visitation provision should specify which weekends, holidays, and other days Husband is allowed visitation; details concerning overnight visits and issues relating to transportation between Wife and Husband; and specify how the visitation schedule will change as the children get older." Id . ¶ 27, 413 P.3d at 126 (citing IC v. DW , 2015 WY 135, ¶ 21, 360 P.3d 999, 1005 (Wyo. 2015) ). In IC v. DW , we held a visitation schedule that only extended until the child was 18 months old insufficient and remanded for entry of a more specific visitation schedule to, among other things, adjust visitation as the child gets older, to "provide a meaningful schedule until he reaches his majority," including to "address summer visitation for a period appropriate to the child's age."[3] Id . ¶¶ 20-21, 360 P.3d at 1005-1006.
[¶36] The district court was required to set forth a custody and visitation schedule for the long-term based on the evidence produced at trial. The district court wisely tailored its custody order to the child's age. The district court did not err procedurally and it did not abuse its discretion in its determinations.
IV. The District Court's Primary Custody Determination
[¶37] The district court engaged in an extensive analysis of the best interests of the child and considered each of the factors listed in Wyo. Stat. Ann. § 20-2-201(a) (LexisNexis 2017). Mother contends the district court's findings of fact on many factors were either not supported by the evidence or directly contrary to the evidence presented at trial. Mother generally focuses only on evidence that supports her position, eliding contrary evidence. Conversely, under our standard of review, Mother must demonstrate that a material factor deserving significant weight was ignored or that a finding was contrary to the evidence or against the great weight of the evidence, affording Father every favorable inference while omitting any consideration of evidence presented by Mother. In re KRA , ¶ 16, 85 P.3d at 437.
Quality of Relationship with Each Parent
[¶38] The district court found Father was probably the child's primary caregiver, stating *170 the child had a good relationship with both parents but a very close, special bond with Father and they spent ample time together, as Father takes the child with him to work on the ranch. Mother faults the court for not defining what the court meant by "primary caretaker" or making more detailed findings to explain how it made this determination. Because Mother did not request more detailed findings, she cannot be heard to complain that the district court did not more fully explain its reasoning. W.R.C.P. 52(a) ; JT v. KD , 2008 WY 104, ¶ 15, 192 P.3d 969, 972 (Wyo. 2008).
[¶39] Mother also claims the court's finding that Father was most likely the primary caregiver is in clear contradiction to the trial evidence. Mother points to the fact that she left her employment to be a stay at home parent for the months after the child was born until the parties separated. Mother omits to explain why the district court erred in not giving this very remote fact weight. Mother points out she enrolled the child in daycare and sought an evaluation from STRIDE and argues she was the parent who had historically provided for the child's emotional and intellectual needs and Father disfavored providing the child specialized educational services. She omits to consider that Father also took the child to daycare and ensured he received the special educational services he needed, as detailed earlier in this opinion. Mother points to Father's testimony that when they were not separated he learned from her how to put the child down to sleep and to give him choices. Mother fails to acknowledge his concurrent testimony that he refused to learn from her that he ought to whip him. And Mother fails to acknowledge this testimony can fairly be read as favoring Father's position that he is a primary caregiver-if he were not, he would not have had the need or occasion to learn how to care for the child. Mother claims the district court failed to address the maternal grandmother's testimony about Mother's relationship with the child. In fact, the district court specifically noted her testimony that Mother is a very good parent and found Mother has a good relationship with the child and is a patient and capable parent.
[¶40] Mother last points to testimony that during the temporary shared custody orders Mother had actual physical custody during half of Father's time and asserts the district court did not discuss this testimony or address the amount of time that Father had custody of the child. In fact, the district court specifically noted this testimony in its summary of the facts and found Father spends ample time with the child and is most likely the primary caretaker. And, Mother fails to address contrary evidence directly refuting this testimony.
[¶41] Mother also claims a legal error. The district court noted courts often evaluate the strengths and deficiencies within each child-parent relationship when deciding custody, citing Lopez v. Lopez , 2005 WY 88, ¶ 18, 116 P.3d 1098, 1102 (Wyo. 2005), for the proposition that the strength of a parent-child relationship is an important factor in predicting a parent's ability to provide for a child's emotional and intellectual needs. Mother argues the district court relied on this Court's quotation of the trial court rather than a holding of this Court. We stated in Lopez that the trial court did not err in weighing the evidence or applying the law. Id . ¶ 19, 116 P.3d at 1103. Even if Mother's textual argument were correct, Mother has not shown the district court made a legal error. No factor is dispositive, but primary caretaker status is often a weighty consideration. Williams , ¶ 19 n.2, 368 P.3d at 546 (citing Walter v. Walter , 2015 WY 53, ¶¶ 10-12, 346 P.3d 961, 965 (Wyo. 2015), and In re Paternity of JWH , 2011 WY 66, ¶ 11, 252 P.3d 942, 947 (Wyo. 2011) ).
Ability of Each Parent to Provide Adequate Care for Each Child
[¶42] The district court found this factor weighed in favor of Father because Father has a large support system, extended family, and close friends in Wheatland to rely on while Mother's babysitter and close friend planned to move and her family lives in Nebraska. The court compared her apparently tenuous ability to subsist financially, with $2,000 per month of take-home income and $1,799 mortgage payment with Father's more stable, albeit in debt, businesses. The court *171 also compared Father's more stable work situation with Mother's new real estate career, which had some flexibility but developing work obligations.
[¶43] Mother faults the district court for not also noting her father lived in Torrington, halfway between Mother's home in Cheyenne and Father's home in Wheatland when discussing the parties' local systems of support. Mother does not explain why it would be an abuse of discretion for the district court to give more weight to a support system located in the same community as a parent.
[¶44] Mother complains that the district court focused on the fact that her friend and babysitter was moving away rather than her testimony that she has childcare in place. Mother does not explain why the district court was required to accord greater weight to her non-specific testimony that she "has some childcare in place" than to the fact that her current childcare arrangements could not continue, or her testimony that the child has been asked not to return to two daycares in Cheyenne and her refusal to answer the question whether there is a facility in Cheyenne where he can be taken.
[¶45] Additionally, Mother argues the court erred in focusing on Father's support system in Wheatland instead of the fact that the child had lived in Cheyenne most of his life rather than the newly purchased ranch. She makes no argument why that's more relevant to the ability of each parent to provide adequate care for the child than Father's support system for childcare.
[¶46] Finally, Mother argues the court should not have been more concerned about her financial stability than Father's. Mother's brief argues the court failed to consider the fact that Father failed to provide support for the child after the temporary hearing and "she had successfully provided for [the child] in the eight months between the hearing on temporary custody and the trial based on her own income." Her brief fails to acknowledge that at the same time she testified her income could increase, she also testified that while Father did not pay child support through the clerk of district court, he put money in her account, she had totaled up how much he paid (she did not testify to the total) and she was satisfied with and appreciated that amount. Mother argues the court should not have found Father's "work situation seems stable, regardless of the amount of debt he owes on his businesses" because his history of owning and operating small businesses shows a lack of stability, pointing to testimony about Father's business debts. She also compares her testimony that her income has the potential to increase with Father's inability to provide reliable information about his income and expenses. But the record contains testimony that in addition to substantial debts, Father's ranch is a going concern and he has assets, including real estate, with substantial value and has a long history of varying levels of success in small business.
[¶47] Mother also claims nothing in the record supports the district court's finding that her work situation is not as flexible as she testified it to be. In reality, the district court found that she had just started her new career in real estate and her work obligations are still developing. She testified that she schedules work around child care obligations but also testified her income could as much as double or triple in the future. It would not be irrational to think that much greater income would entail more work and less flexibility which Mother, being new to the occupation, might not foresee. In sum, the district court's findings that Mother's work situation was less stable and her future financial success less certain than Father's are not unsupported by evidence.
How Parents and Child Maintain and Strengthen Relationship With Each Other
[¶48] The district court found both parents take advantage of the opportunities they have to spend time with the child, Mother has been generous in allowing Father to spend extra time with the child, Father takes advantage of those opportunities, and both parents support the child's best interests by encouraging his relationship with the other parent. The district court concluded this factor weighed in favor of continuing shared custody for as long as possible. The court also concluded this factor weighed in favor of awarding Father primary custody due to *172 their close bond and, because it was a close call, the child should have more than standard visitation with Mother.
[¶49] Mother argues these findings are inconsistent. She claims awarding primary custody when the child enters kindergarten seems completely contrary to continuing shared custody as long as possible. It is not. The parties do not live in the same community and shared custody cannot continue once the child enters school. As explained above, the trial court properly accommodates the growing child.
[¶50] Mother cites the testimony that supports the district court's finding that she has been generous in allowing Father to spend extra time with the child. Mother complains Father's testimony clearly demonstrated that he had, and would continue to use visitation with the child as a tool to hurt Mother. Father testified he told Mother several times he would raise the child without her. Mother acknowledges this was at the time Mother took the child away from him when she first filed for divorce. Father testified Mother took the child and moved out of the marital home without Father knowing and subsequently withheld visits from Father, including one period of almost a month. Her brief claims the district court should have relied on her testimony that was all her first lawyer's fault. There is evidence to support this, including Father's testimony that Mother's first lawyer threatened him[4] and that Mother's lawyer at trial admitted that what her first lawyer did was indefensible. Conversely, Mother offers no legal reason why the general principle that a litigant is bound by the acts of her lawyer-agent, even if grossly negligent, should not apply. See Estate of Dahlke ex rel. Jubie v. Dahlke , 2014 WY 29, ¶ 68, 319 P.3d 116, 132 (Wyo. 2014) ; Tegeler v. State ex rel. Workers' Safety & Comp. Div. , 2013 WY 40, ¶ 11, 298 P.3d 173, 176-77 (Wyo. 2013) ; Hochhalter v. Great W. Enterprises, Inc. , 708 P.2d 666, 670 (Wyo. 1985). Moreover, there is no evidence that Father withheld the child from her for more than hours at a time, getting in his pickup and driving off a few times.
[¶51] Mother's brief also asserts there was no evidence that Father would allow additional visitation if awarded primary custody. In reality, Father testified he thought it unfair Mother's lawyer criticized him for allowing Mother to spend extra time with the child if she had a reason like a family event. He also testified Mother has an open invitation to spend time with the child at the ranch and there has not been a week when he has had the child that she has not. The district court could hardly have concluded Father would not allow Mother additional visitation if awarded primary custody.
How the Parents and Each Child Interact and Communicate and How Such Communication May Be Improved
[¶52] The district court found the parties interact and communicate well with the child and a shared custody schedule, seeing each of them as much as possible, would be conducive to maintaining this. The district court found that after the child starts school, Mother should have a generous visitation schedule, which she would likely be able to take advantage of by tailoring her work schedule.
[¶53] The court also noted Father will be able to spend time with the child when he is off school due to his self-employment. Mother claims this was a mistake. While listing the history of his businesses on direct examination, Father testified that he had obtained a loan as a first-time rancher and was about to purchase cows and "it's my wish to-if the oil and gas doesn't come back, to sell my assets and phase out and become a rancher so I can raise [the child] on the ranch." He also testified he had not worked a full eight-hour day at his businesses in Cheyenne since the divorce because the child is his priority. Mother claims this means his employment history and future are not stable and his employment future was unknown at the time of trial. However, when further inquiry was made on cross examination, Father clarified he did not want anything to do with the oil *173 and gas business if he is able to be with his son; his intention was to be a rancher and his son is his priority.
[¶54] Mother claims it was impossible for the district court to determine that Father's self-employment would make him available to spend time with the child after school. She also reiterates her arguments, detailed above, that the district court should have credited her testimony that she has flexibility at work and childcare in place. Yet Father not only made the general statement that he would be available to take care of the child, he went on to describe what his days at the ranch look like and how the child fits in to them when he is home full-time. There is no reason to think taking care of the child after school would be incompatible with ranching.
Other Factors Deemed Necessary and Relevant by the Court
[¶55] One of the other issues addressed by the trial court was Father's concern that Mother would move out of state with the child. This was a valid concern because Mother had fewer ties to Wyoming than Father and there was evidence she had taken the child out of state in the past. Mother's brief asseverates that the trial court erred in assuming Mother planned to move out of state and used its finding that Mother could potentially move in the future to justify awarding primary custody to Father. Mother also asserts the district court erred in predetermining that either party's relocation outside the geographical distance between Cheyenne and Wheatland would automatically trigger modification of custody, visitation and support without an analysis of whether or not such a modification would be in the best interest of the child. Mother's arguments do not accurately reflect the trial court's ruling (emphasis added).
The Defendant voiced his concern that Plaintiff would take QPB and move out of state. The Court shares this concern because [Mother] seems to have little ties to Wyoming. Some evidence shows that [Mother] once took [the child] and moved out of the marital home without [Father] knowing and subsequently withheld visits between [Father] and [the child]. The Court will emphasize that its custody arrangement is predicated upon both parties living in Wyoming in fairly close proximity to each other. If one party moves out of state or to an in-state town that is far from the Wheatland/Cheyenne area, then the Court would consider a reassessment of [the child]'s best interests and possibly a modification of custody, visitation, and support. See e.g. Jensen v. Milatzo-Jensen , 2013 WY 27, 297 P.3d 768, 773 (Wyo. 2013) (finding that primary custodian's relocation 40 miles away constituted a material change in circumstances that warranted a modification of custody); Arnott v. Arnott , 2012 WY 167, 293 P.3d 440, 458 (Wyo. 2012) (holding that the relocation of a primary custodian to another state may constitute a material change in circumstances that warrants modification of child custody).
Nothing in the ruling suggests the court presumed Mother would move out of state or awarded custody to Father because of that possibility. Nothing in the ruling suggests that the court predetermined that a party's relocation would automatically trigger modification. The court's ruling specifies that if a party moved far away, the court would consider a possible modification of custody, visitation, and support if it were in the child's best interests. The trial court gave the parties an accurate, if brief, summary of the law, explaining why it did not affect the court's current determination and how it might affect the case in the future. Mother does not, and could not reasonably, dispute that the custody arrangement is only practical if the parties live in fairly close proximity.
[¶56] Our standard of review requires us to state the facts in the light most favorable to Father and the light least favorable to Mother. Bearing in mind that the district court had a high opinion of both parents, we take this opportunity to note once again that "the district court's responsibility for fashioning family relationships through custody determinations encompasses one of the most difficult and demanding tasks assigned to a trial judge. This life-altering decision is perhaps most exacting in cases such as this, where it is apparent that both parents love their children *174 and are fit and competent to have custody." Pahl v. Pahl , 2004 WY 40, ¶ 9, 87 P.3d 1250, 1253 (Wyo. 2004) (citations omitted).
CONCLUSION
[¶57] Mother invites this Court to reweigh the testimony and evidence adduced at trial. We decline to do so. To show an abuse of discretion, it "is not enough for an appellant to summarize alleged errors and to give [her] views of the import of the evidence." Lopez , ¶ 20, 116 P.3d at 1103. While the district court's final order may not have characterized every fact as Mother would have liked, or articulated every one of Mother's strengths and Father's weaknesses, nothing in the record demonstrates that the district court's custody decisions were an abuse of discretion.
[¶58] Affirmed.

The record is unclear about when the videos were taken. Mother testified these three videos were taken by her when the child was 18 months old, two years old, and shortly after the second divorce was filed. She also testified the dates in the names of the videos are accurate. The videos are dated before this case was filed.

As discussed above, Father was, in fact, involved in the IEP process.

Numerous secondary sources describe the benefits of age appropriate custodial arrangements. For example, though Father repeatedly criticized the frequent exchanges in the temporary custodial arrangement in the first divorce case, as inconvenient as it may have been for the parents, it was reasonable for the trial judge to think it was in the best interests of their then-infant child. See Michael E. Lamb, Placing Children's Interests First: Developmentally Appropriate Parenting Plans , 10 Va. J. Soc. Pol'y & L. 98, 115 (2002) (citing Joan B. Kelly and Michael E. Lamb, Using Child Development Research to Make Appropriate Custody an Access Decisions for Young Children , 38 Fam. & Conciliation Cts. Rev. 297, 308 (2000) ); see also Farrah L. Spencer & Monica J. Vozakis, Wyoming Statutory Parent-Time Schedules and Parent Plans Minimizing the Impact of Divorce on Children , Wyoming Lawyer at 34, 35 (December 2013).

The district court sustained a hearsay objection to this testimony, but we note a threat is not hearsay, nor is a statement of party opponent's counsel. W.R.E. 801(c), 801(d)(2); see 4 Mueller & Kirkpatrick, Federal Evidence §§ 8:18, 8:51 (4th ed. June 2017 update).