# IN THE SUPREME COURT, STATE OF WYOMING

## 2021 WY 141

**OCTOBER TERM, A.D. 2021**

**December 29, 2021**

DAVID LAURENCE MECARTNEY,

Appellant
(Plaintiff),

v.                                                                  S-21-0105

KELLY CORNELL MECARTNEY,

Appellee
(Defendant).

*Appeal from the District Court of Teton County*
*The Honorable Timothy C. Day, Judge*

*Representing Appellant:*
   Alexandra Mijares Nash, DeFazio Law Office, LLC, Jackson, Wyoming; Lauren B. Browne, Mannen Browne LLC, Jackson, Wyoming.

*Representing Appellee:*
   Richard J. Mulligan, Mulligan Law Office, Jackson, Wyoming; Heather Noble, Attorney at Law, Jackson, Wyoming.

*Guardian ad Litem:*
   No appearance.

*Before FOX, C.J., and DAVIS, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

*GRAY, J., delivers the opinion of the Court; KAUTZ, J., files a concurring in part and dissenting in part opinion, in which BOOMGAARDEN, J., joins.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**

[¶1]     Mr. David Laurence Mecartney (Father) appeals from two district court orders—Decree of Divorce – Custody Order (Custody Order) and Decree of Divorce – Visitation and Transition Order (Visitation Order).  He claims the district court abused its discretion when: (1) awarding primary custody to Ms. Kelly Cornell Mecartney (Mother) during the transition period to joint custody; (2) implementing a fifteen-month, five-phase transition plan; and (3) requiring Father to submit to regular alcohol testing during the transition.  Father also claims the delay of more than seven months prior to the entry of the orders is reversible error.  While the district court abused its discretion in ordering a strict regime of alcohol testing, we affirm the district court's orders in all other respects.

## *ISSUES*

[¶2]     The issues are:

1.     Did the district court abuse its discretion in awarding primary custody to Mother?

2.     Did the district court abuse its discretion in ordering a fifteen-month step up visitation which included a requirement that Father submit to regular alcohol testing?

3.     Did the district court err in taking more than seven months after the final hearing to enter its custody and visitation orders?

## *FACTS*

[¶3]     Mother and Father married in 2004.  Their only child, D., was born in May 2007.  The couple had several homes, including a primary marital residence in Jackson, Wyoming.  Father frequently traveled for his work as majority partner and president of an aviation consulting company.  When D. was born, Mother sold her businesses to become D.'s primary caretaker.

[¶4]     The marriage was contentious from the beginning.  Mother and Father would argue, separate, and reconcile.  Many of these arguments occurred in D.'s presence.  In 2017, the animosity between Mother and Father escalated.  Although they sought counseling to improve their communication skills, any improvement was temporary.  In January 2019, Father returned an expensive necklace he had bought for Mother.  Shortly thereafter,

1

Mother filed for two protective orders claiming domestic abuse.[1]  Father denied the charges and filed for divorce on March 8, 2019.[2]  The court appointed a guardian ad litem (GAL) on May 6, 2019.  The complaint for divorce requested joint legal custody with Mother having primary residential custody.

[¶5]    Initially, neither Father nor Mother contested the prayer for joint legal custody or primary residential custody with Mother.  They did contest the parameters of visitation.  The district court entered a temporary visitation order in December 2019.  At the time of this order, Mother had prevented Father from visiting D. since September.[3]  The temporary order identified inappropriate coparenting conduct by Mother occurring from 2017 through 2019.  This conduct included Mother's interference with communication between Father and D.; filming videos of D. disparaging Father and sending these to Father; coaching D. in what to say to Father; sending Father numerous texts telling him he will never get custody; and sharing the details of the divorce with D.  The district court made clear that Mother's estrangement and alienation efforts were to stop immediately.  The court wrote:

> This is a distressing case.  Each parent is, individually, a multimillionaire.  As a result, their child has privileges other children only see in daydreams and movies.  This child should, ideally, be set up for success.  And yet the GAL's credible offer of proof is that this child has been exposed to more details of this divorce than any child ever should.  The video recording of the child explaining he overheard Mother's conversation with the Department of Family Services and others about this case corroborates that offer of proof.  Mother's offer of proof included a representation that the child is now suffering digestive issues and sleep disorders.  The child is suffering.  The shockwaves of this case are affecting the physical, mental, and emotional well-being of the child.  Including the child in the details of the break up of his nuclear family is damaging to the child.

---

[1] Mother eventually withdrew her requests for protective orders.  Investigations by the Wyoming Department of Family Services found the claims unsubstantiated.

[2] Both Mother and Father had previously filed for divorce in the past, but subsequently withdrew those actions.

[3] In September 2019, Father and D. attended a private father/son event sponsored by Tiffany and Company.  The guests traveled from New York to Texas to attend a professional football game.  The weekend included meeting and dining with the players, watching practice, and attending the game in Tiffany's box seats.  Several weeks later, Mother and D. alleged that when Father drove D. back to the family jet, Father attempted to strangle D. before he boarded the plane.  Father denied the accusation but has not had an unsupervised visit with his son since that time.

The estrangement and alienation efforts must stop and visitation must begin immediately. Asking a twelve-year-old boy to be deprived of his [f]ather for five or more months while the parents wage their war on each other in this case is entirely inappropriate.

[¶6]    The temporary visitation order required: (1) in-person visitation using a supervisor or facilitator not less than once per week; (2) visitation to graduate to unsupervised or overnight visitation at the recommendation of the child's counselor; and (3) telephone or video visitation to begin immediately with a schedule to be set by Ms. Rebecca Wright, the appointed GAL. Despite the district court's clear admonishments and required visitation, none of the steps occurred as directed by the court.

[¶7]    Following the temporary visitation order, D. continued counseling with Dr. Heather Finkel which had begun in October 2019, Mother began counseling with Ms. Jennifer Kandolin, and Father continued counseling with Dr. Julie Elledge, who had been the couple's initial marriage counselor. Mother and Father stipulated to the appointment of a custody evaluator, Dr. Arnold Shienvold. Dr. Shienvold began his investigation in January 2020. On May 26, 2020, he issued a seventy-seven-page report. The report detailed his interviews with friends, teachers, the GAL, medical professionals, and mental health providers, as well as several meetings with Father, Mother, and D. Dr. Shienvold also enumerated the materials he had reviewed, including forty-six videos sent to Father by Mother of D. disparaging Father.[4]

[¶8]    Dr. Shienvold's final recommendation was that D. be removed immediately from Mother's care and that Mother receive "intensive therapy around her problems with exaggerations and mis-perceptions of facts, her problems with dysregulation of emotions, her enmeshment with [D.], and her projection of rage associated with feelings of abandonment and emotional abuse by [Father] onto [D.]" Dr. Shienvold also recommended that Father and D. enter intensive reunification therapy and that D. receive more frequent counseling sessions with Dr. Finkel during the transition. He proposed several steps to accomplish a safe transition of D. to Father's custody. He proposed D. reside with a nonpartisan family for several weeks, but not more than three weeks, while D.'s counselor prepared the foundation for the custody change. He also suggested Father and D. attend an intensive reunification program outside the Jackson area for three to five days to "jumpstart" the process. Father and D. should then continue reunification treatment with a local therapist. Dr. Shienvold concluded:

It is recognized that this is an "extreme" recommendation. However, the factors in this situation dictate these extreme

---

[4] Other materials included numerous text messages, posts on social media, recorded telephone calls, emails, hair follicle test for Father showing a negative presence of drugs, letters, reports, pilot logs, and court orders.

3

measures to insure that [D.] is to have a healthy, stable relationship with his father. It is believed these interventions will not hurt [Mother's] relationship with [D.] In fact, in the long run they may make it stronger, and will definitely make it healthier. As noted, [Mother] is a good parent when she is not caught-up in her anger and disappointment with [Father]. Hopefully, she will work to resolve those issues and become an equal participant in [D.]'s life.

After receiving Dr. Shienvold's report, Father amended his pleadings to request primary physical custody.

[¶9]   A five-day custody trial began on July 20, 2020. Father testified and presented the testimony of the former family physician, the former assistant to Mother and Father who now worked for Father, friends of the family, Dr. Shienvold, and the visitation facilitator for Father's and D.'s visits, Ms. Cheyenne Syvertson. Mother also testified and presented the testimony of Dr. Finkel, family friends, the housekeeper who worked for the family and now worked for Mother, Mother's counselor, Ms. Kandolin, and Mr. Barry Goldstein who was called to rebut Dr. Shienvold's testimony. Over the objections of Father and the GAL, the district court conducted an in camera interview with D. where only the court reporter was present.

[¶10]  Following trial, the district court received post-trial filings, and custody related motions and notices, in August, September, October, November, and December 2020. On January 21, 2021, the GAL learned that Mother had demanded that any communication between the GAL and the family's coparenting therapist be recorded and submitted to the parties' attorneys. On January 26, the GAL learned Mother had imposed the same conditions on her communications with Dr. Finkel and, in addition, required the GAL to copy the attorneys on all emails between Dr. Finkel and the GAL. Mother's conditions were contrary to provisions in the order appointing the GAL.

[¶11]  The GAL had received formal correspondence from D.'s counselor, Dr. Finkel, and the visitation facilitator, Ms. Syvertson, "indicating that the effectiveness of visitation and the relationship between Father and [D.] have deteriorated since trial and are becoming increasingly hopeless." In February 2021, Dr. Finkel delivered a letter to the GAL, addressed to the district court, "that she is no longer comfortable making custody recommendations to the Court because" after receiving Mother's conditions and consulting with an attorney in late January 2021, "she has been advised not to do so by her liability insurance company." Dr. Finkel was willing to continue as D.'s counselor and to communicate through the GAL, "but [was] unwilling to make official recommendations."

[¶12]  Ms. Syvertson also expressed concern. In a letter to the GAL, she wrote: "This is not supervised visitation as it is commonly known. This is not family therapy. This is not

4

reunification therapy.  I am the licensed mental health professional tasked with holding a standing appointment to allow [D. and Father] to be physically together weekly."  Ms. Syvertson emphasized the sessions were deteriorating, and D. was in immediate need for specialized services.  She said she was willing to offer one additional hour-long visitation each week until such time as the family therapist, who placed the Mecartney family on her waiting list, could begin.  As the district court noted in its Visitation Order, "[Ms. Syvertson] has been strained by the amount of conflict between the parents over relatively straightforward issues like scheduling."

[¶13]  In February 2021, while still functioning under the temporary visitation orders, the GAL filed a Motion for Interim Court Order requesting guidelines for visitation given COVID-19 concerns and Mother's imposition of additional conditions on witnesses who might communicate with the GAL.[5]  The GAL concluded her motion by stating:

> It is known to the Court that [D.] has already filed a disciplinary complaint against the G.A.L. with the Wyoming State Bar.  The Court is also aware that the G.A.L. is in regular communication with Wyoming State Bar Counsel . . . to monitor and assess the ethical considerations related to her continued representation of the minor child in this matter.  The G.A.L. is committed to fulfilling the duties of her role until the conclusion of this matter, but if Mother's attempts to interfere with, limit, and monitor the G.A.L.'s communications with witnesses are not stopped, the G.A.L. will have no choice but to ask the Court's permission to withdraw . . . .[6]

[¶14]  On March 11, 2021, the district court entered the two orders at issue here—the Custody Order and the Visitation Order.  The Custody Order awarded primary physical custody to Mother with transition to shared custody, finding the most significant factors on which it based its decision were Mother's stability, primary caregiver status, and the child's preference.  The Visitation Order set forth a two-year, five-phase plan that would evolve to shared custody.  The substance of these orders is presented in more detail in the following discussion.  Father timely appealed.

### *STANDARD OF REVIEW*

---

[5] In the Visitation Order, the district court stated, "The ongoing hostility between Mother and the GAL was articulated in trial testimony and trial exhibits.  Mother's new attempt to require the GAL to provide her attorney work product to Mother['s] counsel . . . is unusual and indicates ongoing hostility."

[6] The district court did not rule on this motion but addressed it in its final Visitation Order concluding: "In sum, the Court and the parties are now without the benefit of the tools that existed at trial and without the tools the Court and other families in this community use in high-conflict cases."

[¶15]  "We review the district court's custody, child support, alimony, and attorney fees decisions for an abuse of discretion."  *Sears v. Sears*, 2021 WY 20, ¶ 13, 479 P.3d 767, 772 (Wyo. 2021).  "Wyoming 'law affords wide discretion to the district court when fashioning custody and visitation provisions for the best interests of the children.'"  *Bruegman v. Bruegman*, 2018 WY 49, ¶¶ 10–12, 417 P.3d 157, 161–62 (Wyo. 2018) (citation omitted).  "Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means exercising sound judgment with regard to what is right under the circumstances and without doing so arbitrarily or capriciously."  *Sears*, ¶ 13, 479 P.3d at 772 (citation omitted).  "A district court does not abuse its discretion if it could reasonably conclude as it did."  *Id.* (citation omitted).  "Our review entails evaluation of the sufficiency of the evidence to support the district court's decision, and we afford the prevailing party every favorable inference while omitting any consideration of evidence presented by the unsuccessful party."  *Johnson v. Johnson*, 2020 WY 18, ¶ 10, 458 P.3d 27, 32 (Wyo. 2020) (citations omitted).  "Findings of fact not supported by the evidence, contrary to the evidence, or against the great weight of the evidence cannot be sustained.  Similarly, an abuse of discretion is present 'when a material factor deserving significant weight is ignored.'"  *Bruegman*, ¶ 12, 417 P.3d at 161 (internal citations omitted).  "This 'discretion encompasses one of the most difficult and demanding tasks assigned to a trial judge.'"  *Id.* ¶ 11, 417 P.3d at 161 (citations omitted).

## DISCUSSION

[¶16]  Father contends the district court's Custody Order awarding physical custody to Mother was contrary to the great weight of evidence, and the district court erred in weighing the child's preference in light of Mother's egregious efforts to influence D. Father maintains the Visitation Order imposing a fifteen-month transition period suffers from the same error.  In addition, Father contests the district court's onerous alcohol testing regimen as unsupported by the evidence.

[¶17]  The "paramount" consideration when awarding custody and visitation is the best interests of the children.  *Sears*, ¶ 14, 479 P.3d at 772.  *See also Martin v. Hart*, 2018 WY 123, ¶ 20, 429 P.3d 56, 63 (Wyo. 2018) ("It has been our consistent principle that in custody matters, the welfare and needs of the children are to be given paramount consideration." (citation omitted)).

[¶18]  A district court must consider the following list of nonexclusive factors when determining custody:

> (i)  The quality of the relationship each child has with each parent;

6

(ii)     The ability of each parent to provide adequate care for each child throughout each period of responsibility, including arranging for each child's care by others as needed;

(iii)    The relative competency and fitness of each parent;

(iv)    Each parent's willingness to accept all responsibilities of parenting, including a willingness to accept care for each child at specified times and to relinquish care to the other parent at specified times;

(v)     How the parents and each child can best maintain and strengthen a relationship with each other;

(vi)    How the parents and each child interact and communicate with each other and how such interaction and communication may be improved;

(vii)   The ability and willingness of each parent to allow the other to provide care without intrusion, respect the other parent's rights and responsibilities, including the right to privacy;

(viii)  Geographic distance between the parents' residences;

(ix)    The current physical and mental ability of each parent to care for each child;

(x)     Any other factors the court deems necessary and relevant.

Wyo. Stat. Ann. § 20-2-201(a)(i)–(x) (LexisNexis 2021).  There is no one factor which controls the decision, and each unique situation may require a different weight be given to individual factors.  *Sears*, ¶ 14, 479 P.3d at 772.  "'The one constant is that the resolution must be in the [children's] best interests[.]'"  *Id.* (citation omitted).  In the custody order, the district court addressed each of the statutory factors.  It also determined that Mother's allegations that Father was physically abusive, an alcoholic, and a drug addict were unsubstantiated.

[¶19]  The district court found that "[w]hile some of the best interest factors were neutral, and some factors tipped heavily in favor of Father, certain critical factors tipped heavily in favor of Mother.  The most significant factors in Mother's favor were stability, primary

7

caregiver status, and the child's preferences." The district court summarized its decision as follows:

> On one hand, Mother has engaged in hostile and aggressive subversion of the Father-child relationship since the parties separated. She has repeatedly disobeyed court orders. She has demonstrated no consistent ability to coparent, communicate as a coparent, or support coparenting. The Court has little optimism that continuing the child's primary residence with Mother will facilitate an appropriate Father-child relationship and a healthy development of the child **without a 180-degree shift in Mother's approach**, and without a set visitation plan with explicit boundaries for the family to follow. The Court believes that Mother has the aptitude to make that 180-degree shift and the ability to abide by the Court's visitation order.
>
> On the other hand, Father has not been the primary caregiver for the child; the child's stability would be better supported by staying with Mother; and, of significant importance, the child emphatically does not want to reside with Father. Those factors—stability, primary caregiver, and the child's preferences—determined the outcome of this unfortunate custody contest.

### I.   *Did the district court abuse its discretion in awarding primary custody to Mother?*

[¶20]   Father makes two arguments regarding the district court's weighing of the statutory factors to conclude primary physical custody with Mother was in D.'s best interests. First, he claims the district court abused its discretion when it determined the relative competency and fitness (§ 20-2-201 (a)(iii)) and the current physical and mental ability of each parent (§ 20-2-201 (a)(ix)) were neutral. Father points to the district court's comment that these factors were "generally neutral," followed by the statement "although the Court notes concerns about Mother's emotional self-regulation and its impact on the child," and "[t]hose concerns weigh against Mother." Father contends that the district court's concerns regarding Mother's conduct adversely impacting D. required a finding that these factors weighed in favor of Father in order to comport with the great weight of the evidence. We agree that Mother's inability to coparent and her inappropriate attempts to involve D. in a campaign against Father were firmly established in the record. However, the district court recognized these defects in Mother's parenting throughout its analysis. The fact that the district court used the phrase "generally neutral" indicates the district court did weigh these considerations in its decision.

[¶21] Second, Father argues the district court abused its discretion when it gave great significance to D.'s preference. Father acknowledges a child's preference may be considered in determining custody. However, Father contends that, under *Yates*, D.'s preference should have been given little, if any, weight as it was based on fabrication and the unsubstantiated claims of abuse.

> In determining the weight to be given a child's preference several factors should be considered: the age of the child; the reason for the preference; the relative fitness of the preferred and non-preferred parent; the hostility, if any, of the child to the non-preferred parent; the presence of other siblings; and whether the child's preference has been tainted or influenced by one parent against the other.

*Yates v. Yates*, 702 P.2d 1252, 1256 (Wyo. 1985).

[¶22] Father is correct that D.'s reasons for his preference were clearly based on his fear and his emotional/physical reactions to his father's presence. It is also true that this was caused, at least in part, by Mother's unrelenting insistence that Father was an alcoholic and drug addicted abuser despite the lack of any objective evidentiary support for those claims. These facts, however, do not prevent the district court from reaching its own determination regarding the depth of D.'s fear and anxiety in the event D. were to be removed from the perceived safety of Mother's care. Nor does it prevent the district court from establishing a custody and visitation arrangement to limit the trauma which D. may experience under the unfortunate facts of this case.

[¶23] Finally, Father maintains the district court abused its discretion when it found that the primary caregiver and stability factors outweighed the many factors which weighed heavily in Father's favor. Father would have us reweigh the evidence to place greater emphasis on the factors that favored him as primary custodian. "The task of weighing the evidence is left to the district court; we do not reweigh the evidence on appeal." *Kimzey v. Kimzey*, 2020 WY 52, ¶ 48, 461 P.3d 1229, 1243 (Wyo. 2020); *Bruegman*, ¶ 57, 417 P.3d at 174. "Our task is simply to determine whether, examining the record in the light most favorable to the successful party, the district court could have reasonably concluded as it did." *Kimzey*, ¶ 48, 461 P.3d at 1243.

[¶24] The district court did not ignore, but repeatedly acknowledged, Mother's steadfast and shocking efforts to denigrate Father and to destroy any relationship between D. and Father. That she was largely successful in these efforts is heart breaking. Nonetheless, the district court's ultimate consideration must be D.'s best interests.

[¶25] The evidence demonstrated that, by the time of trial, an abrupt change in custody would, at least in the short run, adversely affect D. Dr. Shienvold testified that, if Father

9

was awarded custody, "[D.] might be angry and feel [he] wasn't listened to"; "[h]e might just shut down and be quiet [and be] depressed"; "anxiety is another possibility"; it is possible "[he] could become a runaway." While Dr. Shienvold did not see D. as self-destructive, he opined it was also possible he may experience suicidal ideation. Dr. Finkel testified that at first "[i]t would be very stressful" if Mother and D. were separated. Mr. Goldstein, Mother's rebuttal witness, testified, "[D.] has a lot of fear and stress and he has asked the Court, you know, to protect him. And if the Court doesn't, he's going to push that fear and stress deep inside himself and, you know, it's going to be survival mode." The district court was also presented with D.'s in camera statements which clearly established that, true or not, D. believed his father would kill him if he was alone with him and, he refused "absolutely" to live with his father because he would never be safe.

[¶26] All the witnesses, including Father, testified that Mother participated in, and was very attentive to, D.'s scholastic, spiritual, social, and athletic interests. Several stated if Mother were able to overcome her issues, there was hope that Mother might support a strong relationship between D. and Father.

[¶27] The district court asked Dr. Shienvold, "what can you predict, if anything in your professional opinion, if [D.] were to stay in some form of primary custody with [Mother] with expanded visitation . . . [?]" Dr. Shienvold responded:

> [Mother] portrayed an attitude with respect to [Father] as a parent that he was virtually unnecessary, she wrote emails to that effect saying she'd find another dad. She talked about finding father figures currently who will act like a dad [to D.] She said that her idea of a parenting plan was basically if [D.] wants to do an activity with his dad, he can, but it's a fantasy to believe he'll spend [an] overnight with his dad and that his dad has no parenting strengths.
>
> Those are not good prognostic indicators for supporting and encouraging the relationship between [D.] and his father as it evolves. So, my problem is with no other intervention and just having the scenario that you mentioned I think the probability of [D.] having a positive meaningful relationship with dad is low because it would take [D.] breaking away from that attitude on his own and electing to do that. So, that I guess is part A.
>
> So, part B becomes dependent a lot . . . on how supportive [Mother] becomes over time. What's interesting here is the more supportive [Mother] becomes the easier it will be for [D.] to have a relationship with his dad.

10

[¶28]  Dr. Shienvold continued:

> [T]his is a balancing act because we're talking about false negatives and false positives.
>
> . . . [I]f the allegation that [D.] was abused by his dad is a false negative, meaning that it happened but we say it didn't, then somebody is going to say we're putting his mental health at risk obviously and his safety for him to be with his dad.
>
> If on the other hand, it is a false positive, that [he is] kept away from his dad based on a false set of beliefs, it too has a significant negative affect on his mental health.  That was the analysis that I had to do and that unfortunately you have to decide[.]

[¶29]  The parties presented the district court a conundrum of Solomonic proportion.  The district court found no evidence that Father had harmed D. other than the mother's and D.'s questionable reports, and these had been determined unsubstantiated.  D.'s former family physician testified Mother brought D. to her in 2018 with a claim that Father had kicked D. with his golf cleat and injured him.  D.'s physician testified there were no physical marks, abrasions or contusions.  Although D. was limping when he arrived, there was no limp when he left.  At trial, Mother did not call any of the victim advocates who investigated her claims and had refused to sign a release to allow the GAL to speak with them.  Dr. Finkel testified that until just before trial she had agreed with Dr. Shienvold's conclusions that the possibility of abuse was unlikely, but after meeting with D. shortly before the trial commenced, she was unsure.

[¶30]  The district court resolved the dilemma by awarding physical custody to Mother, but it did not disregard the evidence of Mother's efforts to estrange D. from Father and her enmeshment of D. in the divorce proceedings.  The custody determination was conditioned on Mother's conformity with her testimony that she now supports a relationship between D. and Father, and she will comply with the district court's detailed plan to reunify Father and D. in a therapeutic transition to shared custody.  The district court made clear its decision was based primarily on Mother's trial testimony, but warned of consequences if Mother reneged on her statements:

> As counsel is aware, a future modification in custody would be dependent on a material change in circumstances that affect the child.

11

Much of the testimony and evidence presented at trial related to the months leading up to trial, with some of the evidence being six to twelve months old. Little evidence was presented about the most up-to-date circumstances. The Court therefore considers Mother's affirmative statements at trial about her efforts towards coparenting to reflect the current baseline of circumstances. In particular, she is no longer making the videos, is no longer sending hundreds of text messages, and she is engaged in individual therapy to improve her communication and gain some emotional regulation. She stated that she has a parenting contract with the child to "honor our mother and father." . . . She stated she has made "significant strides in supporting what I always wanted, which was for [Father] to be actively involved in our family." Mother testified that she is committed to putting the child's . . . "emotional and physical safety," first. . . . Mother's therapist was able to corroborate that Mother has made progress toward emotional self-regulation. Mother's custody and visitation proposals also corroborate her testimony that she is earnestly devoted to rehabilitating the Father-child relationship. . . .

. . .

Development of new negative videos or communications against Father, coaching the child, using demeaning language about Father, exposing the child to the details of the divorce, or other efforts to defeat rehabilitation, may be considered a change in circumstances rather than a simple basis for civil contempt. Prohibiting visitation or efforts to impair visitation may also be considered as evidence of a material change in circumstances. . . .

This is not to invite a motion for a modification of custody. This is to develop clear expectations of what situation is expected going forward for the best interests of the child. Reversion to past damaging behavior that has been well detailed, but which Mother affirmatively established as over at the time of trial, may potentially be a material change of circumstances.

[¶31] Custody and visitation decisions in highly contested cases are some of the most difficult a district court must make. Indeed, the district court said, "[t]his had been one of the most difficult custody contests in the Court's tenure." We agree that the facts in this

12

case are extremely troubling. "Courts, though they be possessed of the reputed wisdom of Solomon, are conscious of their human fallibility, and the law recognizes that man is without that fore-vision which ensures that his judgment of today will, in light of unforeseen new conditions, prove to be adequate or even proper tomorrow." *Henson v. Henson*, 384 P.2d 721, 723 (Wyo. 1963). The district court did not abuse its discretion in awarding physical custody to Mother during a transitional period leading to shared physical custody at the end of the transition period.

## II. Did the district court abuse its discretion in ordering a fifteen-month step up visitation which included a requirement that Father submit to regular alcohol testing?

[¶32]   Father contends the district court abused its discretion in awarding Mother primary physical custody and then imposing an extended transition period when there was no basis for believing she would comply or cooperate with the district court's orders. Father also argues the district court's alcohol testing regimen is an abuse of discretion because there was no evidence that he consumed alcohol during D.'s lifetime.

[¶33]   The Visitation Order included five phases:

Phase One:   continued facilitated visitation through June 11, 2021; weekly telephone/videoconference and on birthdays and holidays; application to a reunification therapy facility to begin, if possible, on June 14, 2021; counseling for all family members; and Father recording himself taking a home breath test for alcohol and submitting the recording to Mother and GAL. Father was also required to submit to a random test for the effects of alcohol within every thirty days. Beginning May 3, 2021, Father would have four hours every Saturday with D. for unsupervised daytime visitation.

Phase Two:   to begin after the reunification program with the program's written plan for post-program visitation; alcohol testing to continue; and full eight-hour Saturday visitation and one weekday evening visitation beginning the week of August 2, 2021.

Phase Three:  beginning on October 16, 2021, overnight visitation on alternating Saturdays from 9:00 a.m. to Sunday at 5:30 p.m. (with exceptions for holidays); and continued alcohol testing. If the reunification plan requires more visitation, that plan shall be followed.

Phase Four:   beginning February 4, 2022, visitation on alternating weekends from the end of school to the next school day and holidays. Alcohol testing is discontinued.

Phase Five:   beginning June 2022. At this phase, Mother and Father shall enjoy a 50-50 shared custody.

[¶34] Father argues it is uncontested Mother did not comply with the same type of provisions in the temporary visitation order, and the evidence at trial unequivocally established Mother was not a fit parent. We have addressed this argument in the preceding section. Father also argues the visitation schedule fails to consider the consequences if one party does not cooperate. We believe the district court's custody order plainly addresses that possibility as recited above. *See supra* ¶ 30.[7]

[¶35] Father further claims that the district court abused its discretion in ordering alcohol and drug assessments after finding there was no evidence to support allegations of alcohol and drug use. Despite finding no credible evidence of alcohol or drug use, the Visitation Order directed:

> Father shall purchase a portable home breath test. One hour before any in-person visitation, he shall administer the test, record the taking of the test by video, and send the video and a picture of the test results to (1) Mother through Our Family Wizard, and (2) the GAL (for so long as the GAL remains in the case or for any replacement GAL). Father shall also enroll with Advantage Testing and Professional Services . . . for ETG testing which identifies the effects of alcohol. Testing shall be administered randomly, but not more than every thirty days. . . . When Father receives the test results, he shall file them with the Court confidentially, with a certificate of service to Mother. Father is responsible for the costs of this testing.

The testing requirements commenced on the date of the order, March 11, 2021, and continued until phase four of the transition plan, February 4, 2022—almost a year later.

[¶36] We understand the district court's purpose was not to monitor Father. Rather, the purpose of drug tests and alcohol tests, as well as Father's requirement to attend abuse counseling, was to assure D. that, in fact, he was being protected and, importantly, for him to understand the reality of Father's sobriety. While we applaud the district court's efforts to assure D. his interests were being protected, we are not convinced the onerous requirements imposed by the district court is a reasonable avenue for reaching those goals absent any evidence Father had ingested alcohol at any time in the last thirty years.

[¶37] In *Newell*, the father was ordered in the divorce decree to pass random drug and alcohol testing up to three times a year for five years to be entitled to unrestricted visitation of his child. *Newell v. Newell*, 349 S.W.3d 717, 718, 720 (Tex. App. 2011). He did not contest the drug testing requirement but argued that the evidence was insufficient to support

---

[7] The district court made it clear that Mother's noncompliance or resistance may well be considered a material change in circumstances necessitating reconsideration of custody.

the alcohol testing requirement and that the restriction exceeded that required to protect the child's best interest. *Id.* at 720. The appellate court eliminated the alcohol testing requirement because it "effectively requir[ed] [the father] to abstain from any alcohol consumption" for eighty to ninety-two hours preceding visitation of his child when there was only "limited evidence" in the record about his alcohol use. *Id.* at 721. There was no evidence in the record that he had ever been drunk around his child, that he was drinking to the point of intoxication at the time of the trial, that his current or past alcohol use had ever been detrimental to his ex-wife or the child, that he ever drove after drinking, that his personality changed when he drank, or that consuming alcohol within ninety-two hours prior to having visitation with his child would in any way negatively affect the child's best interest. *Id.* at 721–22; *see also In re Pierre*, 50 S.W.3d 554, 559 (Tex. App. 2001) ("We further find, that in the absence of any evidence of drug abuse and any correlation to Relator's ability to comply with the clear order of support, the trial court abused its discretion by requiring Relator to submit to drug and alcohol testing and ordering him to pay for the same.").

[¶38] In this case, the uncontested evidence demonstrated Father's use of alcohol ended thirty years before trial. Nonetheless, the district court's order required Father to film himself taking a home breath test at least once a week and undergo random tests for nearly one year. We appreciate the district court's reasons for ordering testing, and under the proper circumstances such an order is within the authority of the district court.[8] We also appreciate Father had agreed to do whatever was necessary to regain his relationship with D. However, the duration and scope of the regimen ordered by the district court is beyond what might be reasonably anticipated or necessary to assuage D.'s misperceptions. We conclude the district court abused its discretion in requiring this alcohol testing schedule and release Father from further compliance with it.

---

[8]     Numerous studies describe the efficacy of mandated treatment in child custody matters. One study of 1,210 participants in addiction treatments demonstrated that at 1 year follow up, alcohol misusers who had experienced threats regarding child custody did better in comparison with those not experiencing such pressure (Storbjork, 2012). In another study of 200 pregnant women receiving community-based addiction treatment, "women reporting external pressure from legal, housing, or child protection sources: (1) were more likely to remain in treatment; (2) attended a significantly higher proportion of scheduled treatment sessions, despite being scheduled for more than twice as many total hours; (3) were less likely to test positive for illicit drug use; and (4) reported fewer days of drug/alcohol use." (Ondersma, Winhusen, & Lewis, 2010). Although lacking a comparison group, a study of 125 parents with substance use, mandated by Nova Scotia family court to drug testing, demonstrated a 50% reduction in positive tests, and 30% of participants had consistently negative tests (Fraser, 1998a; Fraser, 1998b).
Carol J. Weiss, *Protocol Design and Implementation for Monitoring Parental Substance Use in Child Custody Litigation*, 59 Fam. Ct. Rev. 534, 541 (2021).

### III.    Did the district court err in taking more than seven months after the final hearing to enter its custody and visitation orders?

[¶39]  Father argues the district court committed reversible error when it delayed seven months and eleven days before issuing its final orders.  He maintains this delay violated Rule 902 of the Uniform Rules for District Courts which states: "All civil matters taken under advisement by the court shall be decided with dispatch.  A judge shall give priority over other court business to resolution of any matter subject to delay hereunder, and if necessary will call in another judge to assist."  U.R.D.C. 902.

[¶40]  We recently addressed the same argument in *Castellow v. Pettengill*.  There, the district court waited ten months and twenty days before issuing its decision letter, and thirteen months before issuing its final order.  *Castellow v. Pettengill*, 2021 WY 88, ¶ 9, 492 P.3d 894, 897–98 (Wyo. 2021).  Mother claimed the delay violated U.R.D.C. 902.  We held "the rule is sound advice to courts" but "it lacks both a firm standard ('dispatch' is undefined), or a sanction," comparing W.R.Cr.P. 48(b)(5) ("Any criminal case not tried or continued as provided in this rule shall be dismissed 180 days after arraignment.").  *Castellow*, ¶ 9, 492 P.3d at 897–98.  We also noted, in a different context, there is "a particular concern when courts delay matters involving children."  *Id.* (citing *In Int. of L-MHB*, 2017 WY 110, ¶¶ 30–31, 401 P.3d 949, 959 (Wyo. 2017)).  In both cases, we concluded, that, in the circumstances of the cited cases, "reversal for inordinate delay would only extend the proceeding and would not serve the purpose of expeditiously resolving cases."  We found, "[t]he district court's delay [was] not a basis for reversal." *Id.*

[¶41]  Undue delay in deciding cases is unacceptable, but speed is not all-important.  Other goals—such as fidelity to constitutional principles, adherence to procedural standards, determination of applicable law, resolution of heated quarrels, and advancement of the public interest—compete with pace.  The key is in striking a correct balance.  R. H. Helmholz, "Due and Undue Delay in the English Ecclesiastical Courts (ca. 1300–1600)," 28 *Within a Reasonable Time: The History of Due and Undue Delay in Civil Litigation* 73–92 (C. H. van Rhee ed., 2010) https://doi.org/10.2307/j.ctv1q69scv.6.  In this case, the delay was far shorter than that in *Castellow* and resulted from the complexity of the case.  The district court's Visitation Order highlights some of the hurdles encountered in arriving at a final resolution.  Between the parties, the evaluator, and the GAL, twelve proposed custody and visitation plans were presented to the district court; the parties failed to present sufficient evidence regarding outside resources in the proposed plans; and the availability of these resources had to be addressed through post-trial filings.  Other post-trial filings altered the therapeutic options available to support the child in the transition period by limiting the participation of the GAL, D.'s therapist, and the visitation facilitator.

[¶42]  The delay between trial and order resulted from the complexity of the case, after-trial limitations of available options, and considered resolution strategies employed by the

16

district court. The district court was tasked with formulating a solution to a nearly impossible dilemma in a judicious and thoughtful final order. We conclude the delay was not unwarranted and is not a basis for reversal.

## *CONCLUSION*

[¶43] The district court did not abuse its discretion in its thorough resolution of this high-conflict, complex case. Having sustained Father's challenge to the alcohol testing requirements, we modify the district court's judgment to delete that requirement and affirm the district court's judgment as modified.

**KAUTZ, Justice,** concurring in part and dissenting in part, in which **BOOMGAARDEN, Justice**, joins.

[¶44]  I respectfully dissent from the portion of the majority opinion which finds the trial court abused its discretion by requiring Father to undergo alcohol testing on a temporary basis as a condition of his visitation.  I concur with the remainder of the opinion.

[¶45]  The trial court ordered a four-stage visitation plan on March 11, 2021.  The plan included extensive provisions for counseling and "rehabilitation therapy" designed to restore the relationship between D and Father.  Included with these provisions is a requirement that Father purchase a portable home breath test.  One hour before any in-person visit, Father must video a self-administered test and provide the video with the test results to Mother and the GAL.  He also must enroll in random independent testing "not more than every thirty days."  These testing requirements continue through the first three phases of visitation, ending on February 4, 2022.  They span less than eleven months.

[¶46] A court may impose reasonable conditions on visitation as required by the circumstances of the case, in the best interests of the child.  *See Jacobson v. Kidd,* 2018 WY 108, 426 P.3d 813 (Wyo. 2018) (restricting alcohol consumption even with "scant" evidence of current abuse but a history of alcohol abuse); *Johnson v. Johnson,* 2020 WY 18, 458 P.3d 27 (Wyo. 2020) (imposing counseling to accomplish reunification of children and estranged father).  The circumstances of this case indicate D was extremely fearful of and estranged from his father.  When asked by the trial judge about visits with Father, D testified as follows:

> Court:  What would you like to see happen for you to feel good and feel safe about spending time with your dad?
>
> D:  I don't think I will ever feel completely safe with David.  He's broken my trust.  He's broken promises too many times.  I mean I still don't feel safe even on supervised visitation, but I've developed a plan with Dr. Finkel that Dr. Finkel, I believe, has given to David as a recommendation.
>
> And it's if he wants to have a relationship with me he has to go to anger management classes, some child abuse prevention classes, drug and alcohol rehab.  And then he has to write an – write or say an apology that takes responsibility for all the bad things he's hurt me with and all the things he's done to me and then I would consider it.
>
> But until that, David will continue to lie and deny what he's done.  And until that, I don't want to be – I don't want to

18

have a relationship with a guy who does that. …

> Court: . . . . [If communication improves] would you like to have some visitation then with your dad and start seeing him more regularly and do some of those things that you talked about that you enjoy?

> D: Maybe, but I would have to be supervised. I can't do anything without supervised. I'm too scared. . . .

[¶47] Father acknowledged D had serious misconceptions about his alcohol consumption and indicated he was consulting with a counselor in an effort to address those problems. He testified:

> Q: Are you receiving any other therapy right now?

> A: Yes.

> Q: And can you tell us what those are?

> A: I've started working with an individual named Ryan Burke who's a drug and alcohol counselor just as a point of – he's a point of reference for me. I can check in with him on occasion and he can basically give me an evaluation that could be used if the Court has any issues about drug and alcohol abuse.

> He's also a resource for [D]. [D] has been given a lot of misinformation and disinformation about alcohol and drugs.

[¶48] Court-ordered conditions on visitation should be based on the evidence presented at trial. Here, although there was no evidence that Father currently abused alcohol, there was significant evidence that D was afraid of Father and had concerns about his use of alcohol. The alcohol testing requirements directly address that evidence. They are part of only the first three phases of reunification and last a little less than 11 months.

[¶49] Given the circumstances of this case, the alcohol testing requirements are not an abuse of discretion. The majority concludes the requirements were unsupported by the evidence and an abuse of discretion because Father testified he had not consumed alcohol since 1990. It is obvious the trial court did not order the testing as a motivation for Father to abstain from alcohol. Rather, the purpose of the testing was to alleviate D's sincerely held fears, even if irrational. The testing was incorporated into the graduated visitation plan which in its entirety was designed to ameliorate the fears and anxiety D has toward

19

Father.  At trial, Father testified he was "willing to do whatever it takes to make D feel comfortable to live with [him]."  Because Father told the trial court he would "do whatever it takes to make D feel comfortable," because D has substantial fear of Father, and because the testing requirements are not particularly onerous, I would conclude that the trial court did not abuse its discretion by imposing these requirements.